**HARPER LAW, PLC**
Jon V. Harper (#1378)
Denise Dalton (#9610)
68 South Main Street, Ste. 800
Salt Lake City, UT  84101
Telephone: (801) 910-4357
jharper@jonharperlaw.com
ddalton@jonharperlaw.com

Attorneys for Lewis Tilley and the Putative Class
[Additional Counsel Listed in Signature Block]

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| **LEWIS TILLEY,** individually, and on behalf Of all other similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**MOUNTAIN AMERICA FEDERAL CREDIT UNION, and DOES  1-100,**<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>Case No. 2:17-cv-01120-JNP<br><br>Judge Jill N. Parrish<br><br>Jury Demanded |

Plaintiff Lewis Tilley ("Plaintiff"), by his attorneys, hereby brings this class and representative action against Mountain America Federal Credit Union and DOES 1 through 100 (collectively "MACU" or "Defendant").

## NATURE OF THE ACTION

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel.  Allegations pertaining to Plaintiff or his counsel are based upon, *inter alia*, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in his own right, and in his capacity as the class representative of all others persons similarly situated, and in his capacity as a private attorney general on behalf of the members of the general public. MACU wrongfully charged Plaintiff and the class members overdraft fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to MACU's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches MACU's contract with its customers, who include Plaintiff and the members of the Class.

4.      The charging for such overdraft fees also violates federal law. Because MACU failed to describe its actual overdraft service in its Opt-In Contract (because the language in its Opt-In Contract fails to describe the actual method by which MACU calculates its overdraft fees), and because, alternatively, MACU did not obtain opt-ins from its customers whatsoever, Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) prohibited MACU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but MACU did so anyway.

## PARTIES

5.      Plaintiff is a citizen of the State of Utah and resides in Salt Lake County, and was a member of MACU at all times relevant to the class action allegations.

6.      Based on information and belief, Defendant MACU is and has been a federally chartered credit union with its headquarters in West Jordan, Utah, operating 46 branches primarily in the Salt Lake City, Utah area. MACU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.      Without limitation, defendants Does 1 through 100, include agents, partners, joint

ventures, subsidiaries and/or affiliates of MACU and, upon information and belief, also own and/or operate MACU branch locations.   Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).   As used herein, where appropriate, the term "MACU" is also inclusive of Defendants Does 1 through 100.

8.     Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including Does) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are alter egos in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.   However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over Plaintiff's claim for violation of the federal Electronic Funds Transfer Act, 15 U.S.C. § 1693, et seq., pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's remaining claims under 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District, and pursuant to § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     MACU's Unlawful Charges of Overdraft Fees

15.     MACU is a credit union with 46 branches in Utah and holding approximately $4.8 billion in assets.  MACU offers its consumer banking customers a checking account.  One of the features of a MACU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a MACU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), MACU assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

17.     Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft

4

and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as MACU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions.  (Filene Research Institute Report, "Overdraft Regulation, A Silver Lining In The Clouds?"  Filene Research Institute 2010).

18. The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8.  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

19. Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

20. As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount

of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.   In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").)

22.     To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft and the daily maximum number of fees that may be charged (if there is no maximum, that fact must be stated);

- If the institution offers other means for avoiding overdrafts, such as linking the account to a different account or a line of credit, then it must state that those options exist.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

23.     If the financial institution does not obtain proper, affirmative consent from the customer that  meets all of the requirements of Regulation E's Opt-in Rule, then it is not

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_   Proposed_ Rulemaking.pdf , at p. 74-75.

permitted to charge overdraft fees on ATM and one-time debit card transactions.

24.     At all relevant times, MACU has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to MACU's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

25.     MACU entered into an agreement with Plaintiff and its other customers referred to herein as the "Opt-In Contract." MACU was required by Regulation E to provide this agreement to Plaintiff and the class members, which governs the terms under which MACU may assess Plaintiff and the Class members overdraft fees for ATM and non-recurring debit card transactions, and provides them with the means to accept those terms. Because the Opt-In Contract does not describe the actual overdraft service in which MACU engages, the Opt-In Contract fails to comply with the requirements of Regulation E. The Opt-In Contract nonetheless contains promises to which MACU is contractually bound. In the Opt-In Contract, MACU promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." This promise means that MACU is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction.

26.     MACU also entered into an agreement with its customers via its website in which MACU stated terms regarding its assessment of overdraft fees for ATM and non-recurring debit card transactions, which is referred to herein as the "Online Opt-In Contract." MACU's customers were given the option of accepting those terms by checking a box indicating that they want overdraft coverage for ATM and non-recurring debit card transactions, or rejecting those terms by checking a box indicating that they do not want overdraft coverage for those transactions. By inter alia using the term "overdraft" and failing to provide any information indicating that the dictionary definition of that term was not intended, the Online Opt-In Contract

also indicated that an overdraft fee would only be assessed when the account balance was insufficient to pay for a given transaction.

27.     As used herein, the Opt-In Contract and the Online Opt-In Contract are hereinafter collectively referred to as the "Customer Contracts."

28.     MACU also promised in the Customer Contracts that it would not assess overdraft  fees on ATM and non-recurring debit card transactions against any customer who does not "opt  in" to the overdraft service.

29.     MACU's contractual promises in its Customer Contracts to only assess overdraft fees when there is not enough money in the account to cover the item, and to only assess such fees for ATM and non-recurring debit transactions against customers who had fully "opted-in" to the overdraft program, were also provided to customers in other disclosures and marketing materials.

30.     However, directly contrary to these promises, MACU's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, MACU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation by which it deducts holds it has placed on either pending debit card transactions or deposits, rather than use the actual money in the account as required by the Customer Contracts. The artificial balance MACU creates which it uses to determine whether to assess an overdraft fee is not the customer's actual money in the account.  Rather, it is the balance in a customer's account *minus* anticipated future debits (debits that might or might not  actually occur) and *minus* deposit holds.  Not only is the practice of using this artificial balance  method rather than the money actually in the account to determine whether a transaction results  in an overdraft fee contrary to MACU's Customer Contracts, but this practice has resulted in  MACU improperly charging Plaintiff and the members of the Class unlawful overdraft fees. MACU created this "artificial balance" to increase overdraft fees it charges to its customers.

31.     MACU's practice of charging overdraft fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how MACU expressly describes the circumstances under which overdraft fees are assessed in its Customer Contracts.   Further, MACU has failed to inform its customers, including Plaintiff and the members of the Class, of the conditions under which overdraft fees will be assessed in the Customer Contracts.

32.     MACU also has violated Regulation E by charging Plaintiff and the class members overdraft fees.  Because the Opt-in Contract and the Online Opt-In Contract state that overdraft fees will be assessed only when there is not enough money in the account to cover the transaction at issue, they do not describe MACU's actual overdraft service.   Consequently, MACU was not authorized to charge Plaintiff and the class members overdraft fees on ATM and non-recurring debit card transactions because they do not provide an accurate "brief description of the financial institution's overdraft services" as required by Regulation E's Opt-In Rule.

33.     The Online Opt-In Contract also violated Regulation E because it failed to state the amount of the overdraft fee and the maximum number of fees that can be charged in one day, and failed to list alternatives to the overdraft program, such as linking the checking account to a savings account or a line of credit, even though MACU offers such alternatives.

34.     The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

35.     Plaintiff and the Class members have performed all conditions, covenants, and

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

promises required by each of them in accordance with the terms and conditions of the contracts.

36. Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods. The money actually in the account, without deduction for holds on pending transactions or deposits, is the official balance of the account. It is the balance provided to the customer in monthly statements, which is the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements.

37. Further, based on information and belief, the money actually in the account, without deduction for holds on pending transactions or deposits, is the balance used by MACU to report its deposits to regulators, shareholders and the public. It is the deposit balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of MACU.

38. When MACU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the money actually in the account, without deduction for holds on pending transactions or deposits,. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the money actually in the account but then deducted holds on pending transactions or deposits when determining whether to assess an overdraft fee , then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p.9.)

39. Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks

relief as set forth below.

**B.     Unlawful Overdraft Fees Assessed to Plaintiff**

40.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in his account to cover the transaction. Plaintiff entered into agreements with MACU wherein MACU contracted to charge overdraft fees only if his account did not have money to cover the transaction. By nonetheless charging Plaintiff overdraft fees when his account did contain enough money to complete the transaction, MACU breached its contracts with Plaintiff. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give one example, on January 10, 2016, Plaintiff had $49.31 in his account when he made a debit card purchase for $11.86, leaving him a with a positive balance of $37.45. Despite the fact that his account contained sufficient funds to complete the transaction, Plaintiff was assessed a wrongful "Withdrawal Overdraft Fee" in the amount of $20.00. Plaintiff has a reasonable belief that a complete review of Plaintiff's and MACU's records will show multiple instances in which MACU improperly charged Plaintiff overdraft fees for transactions despite the fact that Plaintiff had enough money in his account to cover the transactions.

41.     Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which MACU assesses further overdraft fees. This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further

lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)    A complete evaluation of MACU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

42.    Additionally, because the Opt-In Contract and Online Opt-In Contract did not describe MACU's actual overdraft service, and/or because the Online Opt-In Contract contained other deficiencies, such as failing to state the amount of the fee to be assessed, failing to state the daily maximum number of fees that could be assessed, and failing to describe alternatives such as linking the checking account to a secondary account or to a line of credit, MACU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions. Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, MACU failed to obtain Plaintiff's fully informed consent as required by Regulation E in order for MACU to be authorized to charge such overdraft fees.  Because MACU was not legally authorized to enroll Plaintiff into the program for non-recurring debit card and ATM transactions, MACU violated Regulation E when it assessed any overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

43.    Plaintiff was harmed by this practice when he was assessed overdraft fees for nonrecurring debit card and ATM transactions. For instance, on January 10, 2016, Plaintiff was charged an overdraft fee for a debit card purchase. A complete evaluation of MACU's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

44.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

45.     Plaintiff brings this case, and each of his respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(1) – (4) and (b)(3) on behalf of the following class.

46.     The "Class" is composed of two classes:

**The Positive Balance Class:**

**All United States residents who have or have had accounts with MACU, signed up for those accounts before June, 2015, and who incurred an overdraft fee or overdraft fees when the money in the checking account was sufficient to cover the transaction or transactions at issue during the period  beginning four years preceding the filing of this Complaint and ending on the  date that this Class is certified.**

**The Regulation E Class:**

**All United States residents who have or have had accounts with MACU,  signed up for those accounts before June, 2015, and who incurred an  overdraft fee or overdraft fees for ATM or non-recurring debit card  transaction(s) during the period beginning on August 15, 2010 and ending on  the date that this Class is certified.**

47.     Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

48.     This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

49.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The

members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that MACU has approximately $4.8 billion in assets and operates 46 branches in Utah.

50.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of MACU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

51.     **Commonality (Federal Rule of Civil Procedure 23(a)(2))** -- This action involves  common questions of law and fact.  The questions of law and fact common to both Plaintiff and  the Class members include, but are not limited to, the following:

a.     Whether, pursuant to the Customer Contracts, Defendant promised  to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b.     Whether Defendant breached the Customer Contracts by assessing  overdraft fees for transactions when customers' checking accounts contained  enough money to cover the transactions;

c.     Whether the language in the Opt-In Contract and Online Opt-In Contract accurately described Defendant's overdraft service pursuant to which  Defendant assessed

overdraft fees using a method by which it deducted for pending transactions and deposits when determining whether to impose an overdraft fee instead of making this determination based on the money actually in the account;

d.      Whether the Online Opt-In Contract stated the amount of the fee to be assessed, the maximum number of fees which can be assessed in one day, and/or the alternatives to the overdraft program which Defendant offered;

e.      Whether Defendant enacted a policy of assessing overdraft fees for ATM and non-recurring debit card transactions against its customers without opting them into the overdraft program whatsoever;

f.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

g.      Whether Defendant's conduct violated state consumer protection laws; and

h.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

52.      **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Customer Contracts, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members. Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class members.

53.      **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts

between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and his counsel intend to prosecute this action vigorously.

54. **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

55. Plaintiff is not aware of any separate litigation instituted by any of the class

members against Defendant.  Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class members and that he will adequately represent the Class.  This particular forum is a desirable forum for this litigation because both Plaintiff and Defendant reside in this District, where Defendant operates branch offices, and where its headquarters are located, and because the claims arose from activities which occurred in this District.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

56.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

57.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.     Without class certification and determination of declaratory, injunctive,  statutory and other legal questions within the Class format, prosecution of  separate actions by individual members of the Class will create the risk of:

1.     Inconsistent or varying adjudications with respect to individual  members of the Class which would establish incompatible  standards of conduct for the parties opposing the Class; or

2.     Adjudication with respect to individual members of the Class,  which would as a practical matter be dispositive of the interests of  the other members not parties to the adjudication or substantially  impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds  generally applicable to each member

of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1.  The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.  The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3.  The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.  The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

58.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

59.  Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Customer Contracts.  These contracts were drafted by and are binding upon Defendant.

60.  In the Customer Contracts, Defendant promised that MACU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

61.  Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

62.     Defendant breached the express terms of the contracts by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

63.     As a proximate result of Defendant's breach of the contracts, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

64.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

65.     Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Customer Contracts.  These contracts were drafted by and are binding upon Defendant.

66.     In the Customer Contracts, Defendant promised that MACU would assess overdraft fees for ATM and debit card transactions only when there was not enough money in the account to cover the transaction.

67.     Further, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of  bad faith in the performance of contracts.

68.     The material terms of the contracts also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the

exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

69.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

70.     Defendant breached the implied covenant of good faith and fair dealing based on its practices of creating an artificial balance when determining whether to assess an overdraft fee on a customer by putting holds on the customer's pending debit transactions and deposits so as to lower the balance below the actual money in the account and then assessing fees based on this artificial balance when there was enough money in the account to cover the transaction; failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions; and, failing to permit its customers to choose whether to opt-in to the overdraft program for non-recurring debit and ATM transactions.  In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant deprived, impaired, interfered with or destroyed Plaintiff's and the other members of the class' right to receive the full benefit of the contract.

71.     As a proximate result of Defendant's breach of the implied covenant of good faith  and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven  at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
#### (Unjust Enrichment/Restitution)

72.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

73.     As a result of the wrongful misconduct alleged above, Defendant unjustly

received millions of dollars in overdraft fees.

74.     The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices. (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

75.     Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.   Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

### FOURTH CAUSE OF ACTION
#### (Money Had and Received)

76.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive- practices.pdf

77.     Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

78.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

**FIFTH CAUSE OF ACTION**
**(Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))**

79.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

80.     By charging overdraft fees on ATM and nonrecurring transactions, MACU violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

81.     Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.)  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.)  The notice "shall be clear and readily understandable." (12  C.F.R.  §205.4(a)(1).)   To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must

provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

82.     The intent and purpose of this opt-in agreement is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

83.     MACU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  MACU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17, and/or by failing to state the amount of the fee, the daily maximum number of fees, or the alternatives to entry into the program, such as linking the checking account to a line of credit or to a secondary account.  MACU's Opt-In Contract and Online Opt-In Contract fail to satisfy 12 C.F.R. § 1005.17 because they state that an overdraft fee will only result when there is not enough money in the account to complete a transaction, when in fact MACU assesses overdraft fees when the actual balance is sufficient to pay for the transaction at issue, but the artificial available balance MACU creates is not.

84.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so MACU has harmed Plaintiff and the Class.

85.     Due to MACU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

**SIXTH CAUSE OF ACTION**
**(Common Law Unconscionability)**

86.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

87.     Defendant's overdraft policies and practices during all or parts of the Class Periods are and have been substantively and procedurally unconscionable in at least the followings respects:

a.     Defendant did not allow Plaintiff or the members of the Classes to "opt out" of Defendant's unlawful overdraft scheme;

b.     Defendant did not have affirmative consent from Plaintiff or the members of the Classes prior to processing transactions that would overdraw their accounts and result in the imposition of overdraft fees;

c.     Defendant has not disclosed to Plaintiff or the members of the Classes when a debit card transaction will trigger an overdraft, and have not provided them with the opportunity to cancel such transactions before incurring an overdraft fee.

d.     Defendant's deposit agreements and related documents, including their Fees Schedules, are contracts of adhesion in that they are standardized forms drafted and imposed by Defendant, which is a party of vastly superior bargaining strength, leaving the customers only the choice of accepting or rejecting the agreement in its entirety;

e.      Any disclosures of the manner and amounts by which Defendant has imposed overdraft fees upon Plaintiff and the members of the Classes have been ineffective, ambiguous, misleading and unfair;

f.      The Opt-In Contract and Online Contract  provided to Plaintiff and the members of the Classes have been ineffective, ambiguous, deceptive, unfair, and misleading in that they have not disclosed that Defendant assesses overdraft fees on an artificial "available" balanceit would create when the actual balance contained enough money to complete the transaction without imposition of an overdraft charge, or that Defendant charged overdraft fees for ATM and non-recurring debit card transactions despite its contractual and legal obligations not to do so without having obtained the affirmative consent of its customers.

88.      Considering the great business acumen and experience of Defendant in relation to the lack of business sophistication of Plaintiff and the members of the Classes, the great disparity in the parties' relative bargaining powers, and the oppressiveness and commercial unreasonableness of the contract terms, the purpose and effect of such terms, the unfair allocation of the risks between the parties, and similar public policy concerns, the contract provisions dealing with overdraft fees are unconscionable and therefore unenforceable as a matter of law.

89.      Plaintiff and the members of the Classes have sustained damages as a result of Defendant's unconscionable policies and practices alleged herein.

### EIGHTH CAUSE OF ACTION
**(Utah Truth in Advertising Act, Utah Code Ann. § 13-11a-1 et seq.)**

90.      The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

91.      In connection with advertising, offering and providing Plaintiff and the members of the Classes its debit card services, Defendant promised Plaintiff and the Class members in its

contracts and in other representations, including advertising and marketing materials, that it would only assess  fees for overdrafts where the transaction at issue exceeded the amount of money in the  customer's account.  Instead, Defendant assessed fees based on an artificial limited portion of the   customer's  account  when  the  actual  balance  contained  enough  money  to  complete  the transaction.  Defendant also engaged in a deceptive act or practice when it charged overdraft fees for ATM and non-recurring debit card transactions despite its contractual and legal obligations not to do so without having obtained the affirmative consent of its customers.  These practices were  deceptive  because  in  committing  them,  Defendant  used  deceptive  representations  in connection  with  its  services,  represented  that  its  services  had   characteristics,  benefits  or qualities  that  they  did  not  and  do  not  have,  and  otherwise  engaged  in  conduct  creating  a likelihood of confusion or of misunderstanding.

92.     Plaintiffs  have  suffered  harm  from  Defendant's  deceptive,  misleading  and  false advertising practices when they were assessed wrongful overdraft fees.

93.     Under § 13-11a-4, Plaintiff and the Class are thus entitled to actual damages or $2,000, whichever is greater, attorneys' fees and costs, and other relief in a form and amount to be  determined by a court of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     For an order certifying this action as a class action;

2.     For  compensatory  and  statutory  damages  on  all  applicable  claims  and  in  an amount to be proven at trial;

3.     For  an  order  requiring  Defendant  to  disgorge,  restore,  and  return  all  monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.     For an order enjoining the wrongful conduct alleged herein;

5.      For costs;

6.      For pre-judgment and post-judgment interest as provided by law;

7.      For attorneys' fees under the Electronic Fund Transfer Act, the Utah Truth in Advertising Act, the common fund  doctrine, and all other applicable law; and

8.      For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

DATED:  October 10, 2017

BY:     /s/ Jon V. Harper_____
Proposed Local Counsel for Plaintiff and the Class

**McCUNE WRIGHT AREVALO LLP**
Richard D. McCune, California Bar No. 132124*
    rdm@mccunewright.com
Jae (Eddie) K. Kim, California Bar No. 236805*
    jkk@mccunewright.com
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

**THE KICK LAW FIRM, APC**
Taras Kick, California Bar No. 143379*
    Taras@kicklawfirm.com
Robert Dart, California Bar No. 264060*
    Robert@kicklawfirm.com
815 Moraga Drive
Los Angeles, California 90049
Telephone:   (310) 395-2988
Facsimile:   (310) 395-2088

Attorneys for Plaintiff Lewis Tilley and the Putative Class

*Pro Hac Vice* Petitions to be submitted